**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**JUDICAL WATCH, INC.,**

    **Plaintiff,**

      **v.**

    **Civil Action No. 15-687 (JEB)**

**UNITED STATES DEPARTMENT OF STATE,**

    **Defendant.**

---

<u>**MEMORANDUM OPINION**</u>

The media spotlight on the search for former Secretary of State Hillary Clinton's emails has long since faded. Indeed, the D.C. Circuit concluded last year that "the State Department has exhausted every reasonable means to retrieve <u>all</u> of Secretary Clinton's recoverable emails" and that further inquiries were unlikely to "squeeze water out of the rock." <u>In re Clinton</u>, 970 F.3d 357, 368 (D.C. Cir.), <u>on reh'g,</u> 973 F.3d 106 (D.C. Cir. 2020). Yet on marches Plaintiff Judicial Watch. In this long-standing Freedom of Information Act suit, it continues to challenge the adequacy of State's search and its withholding of a subset of responsive records under one of FOIA's nine exemptions.

The Court now grants summary judgment for Defendant, holding that both its search and its withholdings were appropriate. It is long past time to close the book on this case.

1

## I.    Background

On March 4, 2015, Plaintiff filed a FOIA request seeking from Defendant "[a]ny and all emails sent or received by former Secretary of State Hillary Rodham Clinton in her official capacity as Secretary of State during her tenure as Secretary of State. The timeframe for this request is February 2, 2009 to January 31, 2013." ECF No. 69-2 (Declaration of Eric F. Stein), Exh. 2 (3/4/15 FOIA Request) at 1.  In response, between May 2015 and February 2020, State processed more than 30,000 responsive records.  See Stein Decl., ¶ 6.  These included copies of emails that Clinton had shared with the Department in 2014, id., ¶ 9, documents provided to it by the FBI from the Bureau's 2016 investigation into whether Clinton had mishandled classified information through use of her private email system, id., ¶ 11, and potentially responsive records that the FBI identified in three subsequent instances and provided to State.  Id., ¶¶ 13-17. Because the Government's exhaustive efforts to locate responsive documents will be discussed at length below, further details need not detain us here.

As the case progressed, the parties narrowed the issues before the Court, see ECF No. 69-1 (Def. MSJ) at 2, and after production of records in part and in full, Plaintiff's challenge was limited to the adequacy of the search and the withholding of documents under FOIA Exemptions 1, 5, and 7(E).  Id. at 1.  The exemptions at issue were further focused in the summary-judgment briefing such that the only one remaining is the deliberative-process privilege of Exemption 5. See Def. Reply at 1; see also 5 U.S.C.§ 552(b)(5).

This case, it is worth noting, is hardly the only one this Court has handled concerning the Clinton emails, and that other litigation helps to inform the current ruling.  In particular, the parties have tussled over whether efforts by the State Department and the National Archives and Records Administration to gather emails from Clinton's private email servers satisfied the

Federal Records Act (FRA) or if a referral to the Attorney General for an enforcement action was needed.  See Judicial Watch, Inc. v. Kerry, 156 F. Supp. 3d 69, 76 (D.D.C. 2016), rev'd and remanded sub nom. Judicial Watch, Inc. v. Kerry, 844 F.3d 952 (D.C. Cir. 2016); after remand, Judicial Watch, Inc. v. Tillerson, 293 F. Supp. 3d 33, 41 (D.D.C. 2017), aff'd sub nom. Judicial Watch, Inc. v. Pompeo, 744 F. App'x 3 (D.C. Cir. 2018).  This Court initially held that Plaintiff's claims that a referral was required were moot "given the steps the government has taken to recover the emails."  Kerry, 156 F. Supp. 3d at 71.  The D.C. Circuit reversed, holding that "the agency could [not] simply ignore its referral duty" if the agency's "initial efforts failed to recover all the missing records (or establish their fatal loss)."  Kerry, 844 F.3d at 956.  On remand, this Court found that the Government had "exhausted all imaginable investigative avenues . . . to obtain any missing emails."  Tillerson, 293 F. Supp. 3d at 41.  The D.C. Circuit affirmed, holding that a referral to the Attorney General would be pointless since "the findings of the District Court make it absolutely clear this case is moot."  Pompeo, 744 F. App'x at 5 (citation and internal quotation marks omitted).

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it can affect the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and internal quotation marks omitted).  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  Dep't of Justice v. Reps. Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  Summary judgment is only proper when the court is assured that the record justifies the result.  See Ctr. For Investigative Reporting v. U.S. Customs & Border Prot., 436 F. Supp. 3d 90, 100 (D.D.C. 2019).

### III.    Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).

To further that purpose, the statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules[,] . . . shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  The Government need not, however, turn over requested information that falls into one of nine statutorily created exemptions from FOIA's broad directive.  Id. § 552(b)(1)–(9). "Those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement."  Food Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2366 (2019) (cleaned up) (quoting Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018)).  Where an agency withholds records, it must show that at least one of the exemptions applies.  See Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975).  To carry that burden, the Government "must provide a relatively detailed justification" for its withholding, "specifically identifying the reasons why a particular exemption is relevant."  Morley v. CIA, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (quoting King v. Dep't of Justice, 830 F.2d 210, 219 (D.C. Cir. 1987)).  This Court can compel the release of any records that do not satisfy the requirements of at least one exemption. See Reps. Comm., 489 U.S. at 755.

In this case, two FOIA questions are at issue: 1) whether Defendant's search for the requested records was adequate; and 2) whether it appropriately withheld 246 documents in whole and in part under Exemption 5.  See ECF No. 73 (Pl. Opp. & MSJ) at 3, 9; see also ECF No. 76 (Def. Reply).  The Court will address each of these in turn.

A.  Adequacy of Search

An agency "fulfills its [search] obligations . . . if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)).  Thus, "[i]n a FOIA case, a district court is not tasked with uncovering 'whether there might exist any other documents possibly responsive to the request,' but instead, asks only whether 'the search for [the requested] documents was adequate.'"  In re Clinton, 970 F.3d at 367 (quoting Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).  The adequacy of an agency's search for documents "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."  Weisberg, 745 F.2d at 1486.  "[T]he agency may meet its burden by providing 'a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched."  Iturralde v. Comptroller of Currency, 315 F.3d 311, 313–14 (D.C. Cir. 2003) (omission in original) (quoting Valencia-Lucena, 180 F.3d at 326).  "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  Truitt, 897 F.2d at 542.

Judicial Watch argues that State's search was deficient in several ways: 1) it failed "to search its own records systems" via "a search of State employees' accounts for emails sent 'to' or 'from' Clinton," which might have "yield[ed] responsive records," Def. Opp. & MSJ at 4–5;

2) the "FBI's investigative effort to 'recover' federal records did not satisfy" State's own burden to conduct a search, id. at 6–7; and 3) "Defendant's reliance on Federal Records Act findings [is] misplaced" because a FOIA inquiry is different from an FRA inquiry.  Id. at 7–8.  Defendant responds that its search must be considered "in the context of the unique circumstances" of former Secretary Clinton's use of email systems that it did not control.  See Def. MSJ at 13. Since she did not use an official government email account, State instead decided "that a reasonable search . . . would entail processing emails provided to the Department by Secretary Clinton, as well as emails provided to the Department by the [FBI]" during its own investigation. See Stein Decl., ¶ 8.  Both parties' positions thus boil down to a single question: is searching the emails sent and received by Clinton that State and the FBI assembled in their earlier investigations sufficient to satisfy FOIA?

At the outset, the Court notes that the recovery of Clinton's emails has been a high-profile endeavor, which received an unprecedented amount of media attention.  Given the stakes, it is unsurprising that State and the FBI would have "already taken every reasonable action to retrieve any remaining emails."  Pompeo, 744 F. App'x at 4, such that "no imaginable enforcement action" would surface more emails.  Id. at 5.  Since those retrieval actions are central to the adequacy of the search in this case, the Court will review them in some depth.

The hunt for the emails on Clinton's personal accounts entailed numerous steps.  First, in response to a letter from Defendant, in 2014 Clinton provided 52,455 pages of federal records. See Stein Decl., ¶ 9; see also Def. MSJ at 7.  The FBI also independently sought out all of her correspondence on her private server including by "seeking consensual access to any email repositories," Tillerson, 293 F. Supp. 3d at 41; "obtain[ing] and forensically search[ing]" a commercial email account and multiple servers and hard drives used for her email system, as

well as multiple devices used by the former Secretary, id. at 39–40; issuing grand-jury subpoenas to phone-service providers and a device manufacturer, id.; and interviewing individuals with whom Clinton frequently corresponded.  Id. at 45.   In August 2016, the FBI, at State's request, provided Defendant with the additional emails that the Bureau had identified in its investigation for both Defendant's review in the FRA context and for "subsequent FOIA processing as appropriate."  Stein Decl., ¶¶ 11–12.  Finally, when State later received from the FBI other potentially responsive documents discovered in three subsequent instances, it also processed and released the non-exempt portions of those documents.  Id., ¶¶ 13, 16, 17; see also Def. MSJ at 12–13.

In this context, it is not clear what more Defendant could reasonably have done to locate responsive records to the request for "[a]ny and all emails sent or received by former Secretary of State Hillary Rodham Clinton in her official capacity as Secretary of State."  3/4/2015 FOIA Request at 1.  The Court recognizes that the FRA and FOIA do not serve identical functions; however, the relevant question here is whether the Department reasonably searched the "files likely to contain responsive materials."  Iturralde, 315 F.3d at 313–14.  It does not undermine the FOIA inquiry if that universe of files was assembled through another investigation as long as it encompasses all of the files expected to have responsive materials.  Indeed, the D.C. Circuit recently held that a district court's grant of a deposition in a FOIA case involving Clinton's emails was not appropriate because that court had not "properly consider[ed]" whether State's search was reasonable.  In re Clinton, 970 F.3d at 368.  The district court had disregarded the fact that "[i]f a search for additional Clinton emails has been exhausted in a Federal Records Act case — under a statutory scheme that does provide a process for the recovery or uncovering of removed records — the grounds for continued foraging in the more limited context of a FOIA

case are fatally unclear." Id.  Here, State searched within the set of emails it had received from

Clinton in 2014 and those provided by the FBI in 2016 and at later dates.  This was a logical

choice given that by the end of the Bureau's search for "all identified e-mail communications"

on the former Secretary's private email system, Tillerson, 293 F. Supp. 3d at 42, "there were no

further steps that could have been reasonably undertaken" to recover "additional Clinton work-

related e-mails."  Id. at 41 (quoting affidavit of Special Agent E.W. Priestap).  Judicial Watch's

arguments that State cannot rely on the results of the FBI's investigation or the FRA

investigation to fulfill its own search obligation thus gain no traction.

Plaintiff's objection that Defendant "has never undertaken a search of its own records

system for responsive records" — since it did not search its own email systems for

correspondence with Clinton — is similarly unavailing.  See Pl. Opp. & MSJ at 7.  State's

decision not to further search its own records was reasonable given that any non-duplicative

emails were unlikely to be found.  While an agency "cannot limit its search to only one record

system if there are others that are likely to turn up the information requested," Nation Mag. v.

U.S. Customs Serv., 71 F.3d 885, 890 (D.C. Cir. 1995), a search here would not have been

"likely to turn up" new responsive documents.  The D.C. Circuit has already found that "the

State Department has exhausted every reasonable means to retrieve all of Secretary Clinton's

recoverable emails."  In re Clinton, 970 F.3d at 368.  Indeed, this Court has rejected efforts by

Plaintiff to interview third parties in case they had unrecovered emails on the ground that the FBI

has already engaged in robust retrieval efforts.  Tillerson, 293 F. Supp. 3d at 46–47.  Such efforts

included interviews with individuals Clinton had regular email contact with, which yielded

correspondence that largely consisted of copies of already-recovered records.  Id. at 45; see also

ECF No. 69-5 (Declaration of E.W. Priestap), ¶ 4.  Considering these efforts, it is unclear that

any new emails would be discovered if Defendant "identif[ied] State employees Clinton communicated with whose emails would reasonably be calculated to produce responsive records," as Plaintiff requests.  See Pl. Opp. & MSJ at 4.  The FBI has already "pursued every imaginable avenue to recover the missing emails," Tillerson, 293 F. Supp. 3d at 47, including interviewing Clinton's frequent correspondents.  State's decision to forgo a search of its emails was thus not improper, as "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them."  SafeCard Servs., 926 F.2d at 1201; see also Def. Reply at 14–15.

All of this digging notwithstanding, it is of course conceivable that a few more responsive records might be found from additional spadework.  "It is well established," however, "that the reasonableness of a FOIA search does not turn on 'whether it actually uncovered every document extant.'"  In re Clinton, 970 F.3d at 367 (internal quotation omitted).  Plaintiff correctly notes that a small number of additional responsive emails were shared with State and produced in 2017, 2019, and 2020, see Stein Decl., ¶¶ 13, 15, 16, 17 but those productions do not suggest that more documents are necessarily likely to be found, cf. Pl. Opp. & MSJ at 6, nor must Defendant's search locate every possible responsive document.  Enough is enough.

B.  Deliberative-Process Privilege

Moving beyond the search, the State Department has claimed the deliberative-process privilege under FOIA Exemption 5 for 246 records that it places into three categories: 1) "deliberative discussions about personnel appointments"; 2) "deliberative documents" such as "drafts and recommended talking points" and "discussions about those drafts"; and 3) "deliberative discussions about foreign policy matters."  Def. MSJ. at 24.

1.  *Legal Framework*

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, under Exemption 5, an agency may withhold from a FOIA requester any "documents[] normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984). Here, the relevant privilege is the deliberative-process privilege, which "protects from disclosure documents generated during an agency's deliberations about a policy, as opposed to documents that embody or explain a policy that the agency adopts." United States Fish & Wildlife Serv. v. Sierra Club, Inc., 141 S. Ct. 777, 783 (2021). It "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer," Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980), and "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001). If such documents were subject to disclosure, the quality of decisionmaking would deteriorate.

To qualify under this privilege, a record must be both "predecisional" and "deliberative." "Documents are 'predecisional' if they were generated before the agency's final decision on the matter," Sierra Club, Inc., 141 S. Ct. at 786, and remain predecisional even if an agency subsequently makes a final decision on the issue discussed in the record. See Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill, 443 U.S. 340, 360 (1979). Documents "are 'deliberative' if they were prepared to help the agency formulate its position," Sierra Club, Inc.,

141 S. Ct. at 786, and thus "reflect[] the give-and-take of the consultative process." Petroleum

Info. Corp. v. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal citations

omitted).  "A document that does nothing more than explain an existing policy cannot be

considered deliberative." Pub. Citizen, Inc. v. OMB, 598 F.3d 865, 876 (D.C. Cir. 2010).

Plaintiff raises few specific objections to any document or category of documents, but

instead argues generally that Defendant's "justifications for its withholdings are largely

boilerplate" and that its "supporting declaration and Vaughn Index do not provide adequate

information to allow Plaintiff and the Court to assess the applicability of the exemption

asserted." Pl. Opp. & MSJ at 9.  The Court considers separately the application of the

deliberative-process privilege to each of the three categories of documents.

### 2.  *Discussions about Personnel Appointments*

State first asserts that emails including "recommendations, assessments, and evaluations"

about potential hiring and staffing should be withheld.  See Stein Decl., ¶ 37(a).  It argues that

these materials are predecisional because they involve opinions made before "any official . . .

action had been taken" and deliberative because they involve a "back-and-forth discussion on the

substance of th[e] recommendations and assessments." Id.; see also Def. MSJ at 24–25.

Disclosing this information, Defendant further contends, would impede candid discussions on

hiring and staffing.  See Def. MSJ at 24–25.  Plaintiff rejoins that State has not offered "adequate

information" for the Court to determine if the exemption applies.  See Pl. Opp. & MSJ at 9.

Judges in this district have repeatedly recognized that "Exemption 5 protects the

'deliberative process' involved in making personnel decisions, an area in which candor is

particularly important." Am. Fed'n of Gov't Emps., Loc. 2782 v. Dep't of Com., 632 F. Supp.

1272, 1277 n.6 (D.D.C. 1986), aff'd, 907 F.2d 203 (D.C. Cir. 1990); see also Pinson v. Dep't of

Just., 202 F. Supp. 3d 86, 112–13 (D.D.C. 2016) (holding exempt  memo "drafted in advance of the decision" on who should be Director of Bureau of Prisons).  Indeed, emails from Clinton herself about "potential personnel decisions" have been appropriately withheld under Exemption 5 because the State Department was carrying out one "of its key [predecisional] responsibilities—staffing itself."  Judicial Watch, Inc. v. Dep't of State, 282 F. Supp. 3d 36, 48-49 (D.D.C. 2017); see also Def. MSJ at 24–25.

The withheld personnel-related information in this case, which is described in some detail in the 50-page Vaughn Index, is similarly predecisional and deliberative.  For example, the Department withheld information in an email with "details about the candidate's status in the selection process, issues for consideration in evaluating his suitability, and a follow-up question from a Department official."  ECF No. 69-2, Exh. 1 (Vaughn Index) at 18.  Information was also withheld that comprised Clinton's questions about "ongoing personnel decisions" that included "specific individuals," as well as "assessments of suitability for specific roles."  Id. at 26.  These kinds of records — which offer opinions, assessments, and questions about possible future hiring decisions — are precisely the type protected under the deliberative-process privilege.  See, e.g., Am. Fed'n of Gov't Emps., Loc. 2782, 632 F. Supp. at 1277.

### 3.  *Draft Documents and Talking Points*

The second category for which State invokes the privilege covers draft documents and talking points.  These materials fall broadly into two sub-categories: 1) draft documents and associated discussions or edits and 2) draft talking points for potential use by Clinton or other officials in conversations with members of Congress, foreign-government officials, and others.  See Def. MSJ at 26.  Defendant argues that these materials are "pre-decisional and deliberative," given that they were developed in "the internal exchange of ideas and recommendations" as

officials determined "a final position regarding the content of the final document."  Stein Decl., ¶ 37(b).  They also "contain selected factual material intertwined with opinion."  Id.

As to the first sub-category, the types of records being withheld include the content of draft reports to Congress and discussions about such drafts, Vaughn Index at 11, 21; draft papers prepared by the Department and other agencies, as well as opinions and deliberations on drafts, id. at 4, 8, 10, 18, 45, 47; draft letters to foreign leaders and officials, id. at 12,14; draft agenda items and edits for an upcoming meeting, id. at 15, 18; and draft speeches.  Id. at 17, 29, 32.  The withholding of records labeled "draft" requires a context-specific analysis as an agency's claim that a record is a "draft" cannot alone shield it from disclosure.  See Sierra Club, Inc., 141 S. Ct. at 786 ("the label 'draft' is [not] determinative").  Here, however, there is no indication that any of the documents withheld reflects a final decision by the agency, especially since the drafts were often accompanied by "redline edits," Vaughn Index at 17, 18; information on "next steps in the drafting process," id. at 21; or "recommend[ed] edits by Secretary Clinton and suggestions for further review."  Id. at 45.  Draft letters and questions about such letters are similarly exempt. See Canning v. Dep't of State, 346 F. Supp. 3d 1, 25 (D.D.C. 2018) ("[A] draft letter can, as appropriate, fall within the deliberative process privilege.").  Opinions, recommendations, and other suggestions sent by email in relation to drafts or policy proposals are also canonical examples of materials protected by the deliberative-process privilege.  See Coastal States Gas Corp., 617 F.2d at 866.  Because all of these documents were generated in "the process by which policy is formulated," Petroleum Info. Corp., 976 F.2d at 1435 (emphasis omitted), they are squarely predecisional and deliberative.

The withholding of talking points is somewhat more complicated, but ultimately those at issue here clearly fall within the privilege.  "The D.C. Circuit has not determined, as a

categorical matter, 'whether or not discussions about public statements to outside entities are protected under the deliberative process privilege.'" Ecological Rts. Found. v. EPA, 2021 WL 535725, at *15 (D.D.C. Feb. 13, 2021), opinion vacated in part on reconsideration, 2021 WL 2209380 (D.D.C. June 1, 2021) (internal citations omitted). However, "the overwhelming consensus among judges in this District is that the privilege protects agency deliberations about public statements, including the use of talking points." Leopold v. Off. of Dir. of Nat'l Intel., 442 F. Supp. 3d 266, 276 (D.D.C. 2020) (collecting cases); see also Judicial Watch, Inc. v. Dep't of State, 306 F. Supp. 3d 97, 115 (D.D.C. 2018) (courts "have repeatedly concluded that talking points prepared for use in congressional testimony are deliberative and predecisional documents subject to FOIA exemption 5"). While draft talking points or deliberations about talking points are usually protected, the same logic does not apply to final talking points that are viewed as ready for an official to use. See Ecological Rts. Found., 2021 WL 535725, at *18 ("[A] rule that deems [final talking points] as mere recommendations about what a decisionmaker should say undermines FOIA's larger aims by effectively allowing an agency to withhold all records related to its public communications and protecting even final decisions from public view.").

The nine records that the Department withheld on the basis that they contained proposed talking points were generally instances of lower-level officials offering suggested points to the former Secretary or other senior officials. See, e.g., Vaughn Index at 3 (official's "proposed talking points for engagement by senior Department officials"); id. at 9, 15 ("proposed talking points" for Secretary Clinton's possible use). In one instance, Defendant withheld "a call sheet for a potential call with a foreign government official," which included "proposed talking points for potential use." Id. at 8. Although a call sheet or similar document might be final in some instances, see, e.g., Ecological Rights Foundation, 2021 WL 535725 (Exemption 5 did not apply

to documents shared with EPA Administrator in calendar entries for scheduled calls because "all evidence indicates that these talking points were intended for [his] actual use during the calls"), here there is no evidence to indicate that these talking points were intended for "actual use during the call[]" or that the call was even scheduled. These talking points are thus "predecisional" since they were drafted in advance of possible comments with no indication that they were the exact points the Secretary or other officials employed, or that there was a plan for them to be used at all. See Am. Ctr. for L. & Just. v. Dep't of Just., 325 F. Supp. 3d 162, 173 (D.D.C. 2018) (holding privileged talking points prepared for Attorney General and recognizing that even "the 'final' version of talking points prepared by more junior staffers for a more senior official is rarely" what is said); see also Leopold, 442 F. Supp. 3d at 285 (State Department talking points shared prior to briefing were "pre-decisional"). These points were also generated as part of the deliberative process of lower-level officials helping the Secretary and others determine what they might say. If such draft points were disclosed, junior officials might be "less likely to address difficult or controversial issues for fear that such issues would be emphasized for the public, . . . [which might] lead to less informed and less prepared senior officials." Leopold, 442 F. Supp. 3d at 286.

### 4. *Discussions about Foreign Affairs*

Finally, Defendant argues that certain records were withheld because they relate to "diplomatic and foreign policy matters" that officials would "be unable to candidly discuss . . . if they believed the content of those discussions . . . would later be released to the public." Stein Decl., ¶ 37(c). "The interest of the Department of State in candid discussion in the course of formulating foreign policy is protected by the deliberative process privilege." Brinton v. U.S. Dep't of State, 476 F. Supp. 535, 542 (D.D.C. 1979), aff'd sub nom. Brinton v. Dep't of State,

636 F.2d 600 (D.C. Cir. 1980); see also Canning v. Dep't of State, 453 F. Supp. 3d 332, 337

(D.D.C. 2020) ("matters relating to foreign relations and foreign commerce [are] areas where the

deliberative process privilege applies with special force").

Here, the descriptions that State has provided in the Vaughn Index indicate that the

withheld records were deliberative materials generated "in the course of formulating foreign

policy." Brinton, 476 F. Supp. at 542. They include, among other records, emails discussing the

development of policy towards Israel, South Asia, and Afghanistan, see, e.g., Vaughn Index at 3,

7; emails where officials offered analyses and opinions on public messaging regarding the

Middle East, Afghanistan, and Pakistan, see, e.g., id. at 1, 15; assessments of calls with foreign-

government officials, see, e.g., id. at 14–15; and emails discussing potential outreach to foreign-

government officials. See, e.g., id. at 1, 8. These and other withheld records reflect the

deliberative process of helping the Department "formulate its position" on key areas of foreign

policy, messaging, and outreach, Sierra Club, Inc., 141 S. Ct. at 786, through "the give-and-take

of the consultative process" between former Secretary Clinton and other Department

officials. Petroleum Info Corp., 976 F.2d at 1434. They are thus covered by the privilege.

*     *     *

Two outstanding issues remain before we conclude our tour of Exemption 5. First, six of

the emails that State withheld were sent to or from individuals not in the U.S. government. See

Def. MSJ at 29. Two were from outside individuals offering recommendations on how Clinton

should approach aspects of upcoming foreign travel, Vaughn Index at 18, 47; one was an email

with recommendations from the outgoing chair of a committee in an international organization,

id. at 37; two were communications with potential Department personnel about areas of work

and the confirmation process, id. at 18, 39; and one was an email with the chair of a federal

17

advisory committee.  Id. at 40.  These communications are not "inter-agency or intra-agency"
communications that would typically fall within the scope of Exemption 5.  See 5 U.S.C.
§ 552(b)(5).  The D.C. Circuit has held, however, that some such communications can be
protected under the "consultant corollary," which applies when "(1) the agency solicited the
records from the non-agency party or there exists some indicia of a consultant relationship
between the outsider and the agency, . . . and (2) the records were created for the purpose of
aiding the agency's deliberative process."  Dep't of State, 306 F. Supp. 3d at 106–107 (citations
and internal quotation marks omitted); see also CNA Fin. Corp. v. Donovan, 830 F.2d 1132,
1161–62 (D.C. Cir. 1987) ("If information communicated is deliberative in character it is
privileged from disclosure, notwithstanding its creation by an outsider."); Nat'l Inst. of Mil. Just.
v. Dep't of Def., 512 F.3d 677, 680 (D.C. Cir. 2008) (recognizing that "consultations [with
outside individuals] are an integral part of [an agency's] deliberative process [and] to conduct
this process in public view would inhibit frank discussion of policy matters and likely impair the
quality of decisions").

        The emails at issue here either contained recommendations solicited from the Department
or arose in the context of a consultative relationship — such as with members of an advisory
committee or an international organization of which the U.S. was a part.  These communications
also aided State in its deliberative processes of preparing for foreign travel, staffing itself, and
other core policymaking activities.  These emails were thus appropriately withheld despite
involving non-governmental parties.

        Next, in objecting to Defendant's withholdings, Judicial Watch appears to import a
standard from the FOIA Improvement Act of 2016 by arguing that State has "fail[ed] to indicate
how disclosure would chill the exchange of information" with enough specificity.  See Pl. Opp.

& MSJ at 10.  Plaintiff recognizes that the Act "does not technically apply here," ECF No. 78 (Pl. Reply) at 7, because the requirement that an agency must "reasonably foresee[] that disclosure would harm an interest protected by an exemption" for that exemption to apply was only introduced for FOIA requests submitted after June 30, 2016.  See FOIA Improvement Act §§ 2, 6, Pub. L. No. 114-185, 130 Stat. 538, 539 & 554–45 (2016) (codified at 5 U.S.C. § 552(a)(8)(A)(i)).  Plaintiff's FOIA request, conversely, was submitted in 2015, when this "foreseeable harm" standard was not yet law.  To the extent that Plaintiff claims that guidance at the time dictated a higher standard, see Pl. Reply at 7, its brief cites nothing for that conclusion.  Defendant also has provided the type of "specific, detailed explanation" required at the time to justify the exemptions.  Roth v. Dep't of Justice, 642 F.3d 1161, 1185 (holding that FBI had "generally struck an appropriate balance" of publicly explaining to extent possible why information was withheld due to confidential sources and then relying on in camera review).  Defendant explains, for example, the damage to the candid exchange of views that might occur from releasing details of pending personnel decisions, draft letters, or draft talking points.  See, e.g., Stein Decl., ¶ 37(a)–(b).  Any lack of specificity relating to the described harm thus does not undermine the outcome here.

## 5.  In Camera *Review*

Not ready to throw in the towel, Judicial Watch next asks the Court to review the withheld records *in camera*.  See Pl. Opp. & MSJ at 11.  It is indeed within the district court's discretion to "examine the contents of . . . agency records *in camera*. . . ," 5 U.S.C. § 552(a)(4)(B), but "[a]n *in camera* review should not be resorted to as a matter of course, simply on the theory that 'it can't hurt.'"  Quinon v. FBI, 86 F.3d 1222, 1228 (D.C. Cir. 1996) (quoting Ray v. Turner, 587 F. 2d 1187, 1195 (D.C. Cir. 1978)).  That is nonetheless what Plaintiff seems

19

to suggest, arguing that Defendant's affidavits are insufficiently detailed, and thus the Court should review its privilege claims, especially since the relevant documents are "few in number and of short length."  Pl. Opp. & MSJ at 11 (internal citation omitted).

To start, while Plaintiff does not hesitate to task the Court, there are actually 246 emails at issue in this case, hardly few in number.  More importantly, there is no need for *in camera* review given the specific information already provided in support of the exemptions. "[S]ummary judgment is appropriate without *in camera* review of the documents" "[i]f the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith."  Am. Civil Liberties Union v. Dep't of Defense, 628 F.3d 612, 626 (D.C. Cir. 2011) (internal quotation marks omitted).  Plaintiff makes no allegation that Defendant either acted in bad faith or provided reasons inconsistent with the record.  The information contained in the declarations and the Vaughn Index is also sufficiently specific as to why each withheld record falls under Exemption 5, as it explains the type of record and the potential harm to different government functions that could result from release.  See Stein Decl.; see also Vaughn Index.

### 6.  *Segregability*

Judicial Watch falls back on the proposition that even if all of the documents need not be released, at least some portions should be.  See Pl. Opp. & MSJ at 12–13.  Under FOIA, an agency must release all of the "reasonably segregable portion[s]" of responsive records, see 5 U.S.C. § 552(b), unless the information is "inextricably intertwined with exempt portions." Mead Data Cent., Inc. v. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  Agencies must offer a "detailed justification" for why information is not segregable but need not "provide

so much detail that the exempt material would be effectively disclosed." <u>Johnson v. Exec. Office for U.S. Att'ys</u>, 310 F.3d 771, 776 (D.C. Cir. 2002).  They "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." <u>Sussman v. U.S. Marshals Serv.</u>, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Here, State attests that it has "conducted a careful, line-by-line review of each document" and determined that no further material can be released.  <u>See</u> Stein Decl., ¶ 47.  It also submitted a <u>Vaughn</u> Index explaining why the relevant portions of records were withheld.  <u>See</u> <u>Johnson</u>, 310 F.3d at 776–77 (upholding determination of non-segregablity based on detailed <u>Vaughn</u> Index and affidavit describing line-by-line review).  Copies of the partially withheld documents posted online by the State Department reflect such a review and suggest that all segregable information has already been released.  <u>See, e.g.</u>, <u>Vaughn</u> Index at 1 (C05760713); 42 (C05782922); <u>see also</u> ECF No. 77 (Def. Reply & Opp.) at 27; <u>Judicial Watch, Inc.</u>, 235 F. Supp. 3d 310, 315 (D.D.C. 2017) (noting that State "segregated individual sentences in most of the records" in concluding there was not further segregable information). Defendant's job is done.

## IV.     Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: <u>August 3, 2021</u>